IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 9, 2009 Session

**SANDRA WALKER, ET AL. v. METROPOLITAN BOARD OF
PARKS AND RECREATION, ET AL.**

**Appeal from the Chancery Court for Davidson County**
**No. 07-1166-II     Carol L. McCoy, Chancellor**

**No. M2007-01701-COA-R3-CV - FILED DECEMBER 30, 2009**

**AND**

**SANDRA WALKER, ET AL. v. METROPOLITAN BOARD
OF PARKS AND RECREATION, ET AL.**

**Appeal from the Chancery Court for Davidson County**
**No. 07-2480-III     Carol L. McCoy, Chancellor**

**No. M2008-01226-COA-R3-CV - FILED DECEMBER 30, 2009**

**AND**

**ORGANIZED NEIGHBORS OF EDGEHILL (O.N.E.), ET AL.
v. METROPOLITAN BOARD OF ZONING APPEALS, ET AL.**

**Appeal from the Chancery Court for Davidson County**
**No. 07-2310-II     Carol L. McCoy, Chancellor**

**No. M2008-02218-COA-R3-CV - FILED DECEMBER 30, 2009**

**AND**

**ORGANIZED NEIGHBORS OF EDGEHILL (O.N.E.), ET AL. v.
METROPOLITAN GOVERNMENT, ET AL.**

**Appeal from the Chancery Court for Davidson County**
**No. 08-48-II     Carol L. McCoy, Chancellor**

**No. M2008-01748-COA-R3-CV - FILED DECEMBER 30, 2009**

Two residents of the Edgehill neighborhood of Nashville, as well as an organization of neighborhood residents, filed petitions for writ of certiorari with the aim of preventing the Metropolitan Government of Nashville and Davidson County from entering into a lease agreement with Belmont University. The same parties also brought a petition for declaratory judgment challenging the lease. The proposed lease provided that the University would construct an extensive sports complex in a public park located in the petitioners' neighborhood for the use of the University as well as local schools and neighborhood residents. The first petition was filed after a public meeting at which the Metro Parks Board recommended that the lease be adopted, but before it was actually approved by the Metro Council. The trial court dismissed it without prejudice as premature. Subsequent petitions were filed after the Metro Council voted to approve the lease. The petitioners argued that the process the Parks Board followed was arbitrary and capricious, that it deprived them of their right to procedural due process, and that the action of the Metro Council was invalid because it was based on a flawed process of recommendation. The trial court dismissed all the petitioners' claims. Because the Board's recommendation was not a final order or judgment resulting from the exercise of judicial functions, and because the record showed that there was a rational basis for the Metro Council's decision, we affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

PATRICIA J. COTTRELL, P.J.,M.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

Joseph Howell Johnston, Nashville, Tennessee, for the appellants, Sandra Walker and Janice Richardson.

Richard L. Tennent, Nashville, Tennessee, for the appellants, Organized Neighbors of Edgehill (O.N.E.), Arlene Lane, et al.

Sue B. Cain, Director of Law, The Department of Law of the Metropolitan Government of Nashville and Davidson County, Lora Barkenbus Fox, Assistant Metropolitan Attorney, Paul Jefferson Campbell, II, Assistant Metropolitan Attorney for the appellees, Metropolitan Board of Parks and Recreation;

John Lee Farringer, IV, for the appellee, Belmont University.

**OPINION**

The appeals decided in this opinion arose from challenges to an agreement between the Metropolitan Government of Nashville and Davidson County ("Metro") and Belmont University ("Belmont") regarding the use and development of a public park. As will be explained below, these challenges resulted in lawsuits that took various procedural forms, involved some of the same parties, and were subject to consolidations, transfers, severances, and joinder of claims in the trial

court.[1]  We need not, and will not, detail in every particular the complicated procedural path that led the cases to these appeals.  We have concluded that several issues exist that should be addressed, regardless of the action in which they were raised, and that it will be simpler and clearer to decide all the appeals in one opinion, because they all arise from the same set of facts and share related issues.

Two residents who live near the park in question,  Sandra Walker and Janice Richardson, as well as a community organization called Organized Neighbors of Edgehill ("O.N.E.") filed actions challenging Metro's decision to enter into a longterm lease with Belmont.  They named, as various defendants or respondents in the different actions, all the Metro entities that played some part in the process(es) resulting in approval and implementation of the lease: Metropolitan Board of Parks and Recreation ("Parks Board'), the Metropolitan Planning Commission, the Metropolitan Council ("Council"), and the Metropolitan Board of Zoning Appeals ("the BZA").  Belmont University was also named as a defendant or respondent.

Eventually, the various actions were appropriately separated out by the trial court into claims properly brought by common law writ of certiorari and those properly brought as actions for declaratory judgment.  Like claims were joined or consolidated, and dissimilar claims were severed.[2]  All of the cases arose from the same proposed transaction, and the underlying facts are not in dispute.

## I. A PLAN FOR A PARK

E.S. Rose Park is a 23.88 acre park in the Edgehill neighborhood of Nashville.  It is owned by Metro and is managed by the Parks Board.  Much of the park is undeveloped, but it is crossed by trails that neighboring residents use for walking and bicycling.  One acre contains the Easley Community Center and a public swimming pool.  There are also a baseball field and two playgrounds.  Two public schools adjoin Rose Park and use its facilities: Carter-Lawrence Elementary School and Park Middle School.  Hume-Fogg High School, located in another part of the city, uses the Rose Park baseball field for its games.

Belmont University is a private university located about ten blocks away from Rose Park.  It has a number of varsity athletic teams sanctioned by the NCAA, including men's and women's baseball, soccer and track teams.  In January of 2006, Belmont asked Metro if some of its athletic teams could use Rose Park.  That request led to discussions with the acquisition/disposition committee of the Parks Board and finally to the drafting of an agreement which the committee

---

[1] This court consolidated the four appeals into two for purposes of briefing and argument.

[2] For example, the declaratory judgment claim by Ms. Walker and Ms. Richardson against the Metro Council was severed from their certiorari claims and was joined with O.N.E.'s case through an "Amended Joint Petition for Declaratory Judgment and Injunctive Relief."  Appellate causes of action, like a petition for common law writ of certiorari, may not be combined with original causes of action, like petitions for declaratory judgment.  *Hunter v. Metropolitan Board of Zoning Appeals*, No. M2002-00752-COA-R3-CV, 2004 WL 315060 at *4 (Tenn. Ct. App. Feb. 17, 2004)(no Tenn. R. App. P. 11 application filed).  The Walker and Richardson petition did not specifically refer to declaratory judgment.  However, the trial court deemed the claim against the Metropolitan Council to be one for declaratory relief and, accordingly, allowed it to be severed from the claims against the other governmental entities.

recommended to the full membership of the Board "contingent upon conditions relative to scheduling, traffic control/parking being resolved and subject to approval by Metro Legal before the final contract is signed."

The proposed agreement was a 40 year Property Improvement and Lease Agreement ("the Agreement"). It provides that Metro will continue to own Rose Park and to operate it through the Parks Board. Belmont will lease 22 acres of Rose Park and, at its own expense (estimated at about $6,900,000), will design and construct upgrades to the baseball field and to common areas of the park, as well as a new softball field, soccer field, track, and field house. The Agreement recites that the facilities will be used by Belmont's athletic teams, as well as by residents of the general community and the public schools. Article 6 of the Agreement, captioned "Use of Improvements by Belmont," declares among other things that "[i]n scheduling Belmont Events that are intercollegiate competitions, Metro shall, at all times during the terms of this Agreement, make reasonable efforts to schedule Belmont's first choice of dates and times."

After consideration by various entities, as described below, and various amendments, the final version of the Agreement approved by Council contained a provision that Belmont make a yearly lease payment of $50,000 to Metro, with a 3% increase each year for inflation, with twenty percent of the lease payments to be given to the parent-teacher organizations of the two public schools adjoining Rose Park, and the remaining eighty percent to be given to the Parks Department, to be specifically dedicated to the Easley Community Center. Those dedicated funds are to be used to support improved programing for area youth and seniors, and "will not supplant regular funding provided to Metro Parks for the operations of the Easley Center."

## II. ACTION BY THE PARKS BOARD

Consideration of the lease agreement was included on the agenda of a Parks Board meeting scheduled for May 1, 2007. Prior to the meeting, Metro's Director of Parks and Recreation and Parks Board members received a petition in opposition to the proposed Agreement signed by 325 residents and property owners of the Edgehill community, supplied by O.N.E. Delivered at the same time was a nine-page document containing suggestions for changes to the Agreement to make it more equitable for the community, in the view of O.N.E.

At the May 1 meeting a number of citizens addressed the Board to express their concerns about the proposed Agreement or their outright opposition to it, including a member of the Metro Council and former principal at Carter Lawrence School, a representative of a group that wanted to present a different plan, and the pastor of an Edgehill church. Ms. Lane, a member of O.N.E.'s Board, also spoke and submitted a document setting out O.N.E.'s concerns about the Agreement and urging the Board to defer voting on it. The document was filed as an exhibit to the proceedings. Ms. Walker and Ms. Richardson, who were also members of O.N.E., were unsuccessful in their requests, made through their attorney, to speak individually at the meeting.[3]

---

[3] Ms. Walker and Ms. Richardson had retained Mr. Joseph H. Johnston as their counsel. He sent a letter dated April 13, 2007, to the Chair of the Parks Board asking that he be sent a copy of the proposed agreement "at least ten days prior to the Board meeting wherein it will be considered" and announcing that his clients wished to attend and to speak

(continued...)

During deliberations by the Board, several members expressed their appreciation for the valuable citizen input, but also stated that they believed on balance that the project should be allowed to go forward. One member stated that he felt that Article 6 of the proposed Agreement did not make Metro's role in the operation of the park sufficiently clear. He stated that "in my view, Metro cannot abandon, cannot abrogate, nor delegate, its responsibility to determine the dates, time of usage, and types of usage in this project." He said that input from Belmont was welcome and acceptable, but that Metro, through the Parks Board, had to be the ultimate gatekeeper for the use of the park.

Belmont President Bob Fisher was asked if he understood the Agreement to provide that Metro would be the gatekeeper and the controller of scheduling. He stated that he did, but that he would not object to having the language about that provision strengthened. A board member then moved that the Board recommend approval of the Agreement contingent on the suggested modification to Article 6. After discussion, it was agreed that the proposed change could be drafted and sent to the members within a few days and that they could confirm their approval of it by "e-mail vote or some sort of proxy." The Board then approved the motion unanimously.

### III. The First Petition

On May 23, 2007, Sandra Walker and Janice Richardson ("Petitioners") filed their first Petition for Writs of Certiorari and Supersedeas in the Chancery Court of Davidson County, naming the Parks Board, the Metropolitan Planning Commission, and Belmont University as respondents. (Chancery Court No. 07-1166-II).

The trial court granted writs of supersedeas and ordered that the administrative record be sent up for review. The writs had the effect of suspending any further proceedings by the bodies subject to them.[4] Metro and Belmont then filed a motion to dissolve the supersedeas, and Metro filed a motion to dismiss the petition entirely because it was premature. Metro also asked for an expedited hearing of the matter.

---

[3](...continued)
at that meeting. The letter was sent by certified mail, return receipt requested, and it was delivered on April 19, 2007. The record shows that the Metropolitan Department of Law sent Mr. Johnston a copy of the proposed Agreement by fax on April 27, 2007. However, neither Mr. Johnston's name nor the names of his clients were placed on the agenda of the meeting, apparently because his request was received after April 17, 2007, when the Board agenda was prepared, and after the deadline for such requests had passed, according to the rule followed by the Board.

At the meeting, Mr. Johnston rose to speak for his clients and explained that while he knew he was not on the agenda, he wanted his letter of April 13 to be placed into the record as well as an "administrative complaint" he filed against Belmont University and the Metro Parks Department, reciting his clients' legal and factual objections to the Agreement. Mr. Johnston stated that he had served his "administrative complaint" on every Board Member and on the President of Belmont University.

[4]Tenn. Code Ann. § 27-9-106(a) states that "[i]f the order or judgment rendered by such board or commission made the basis of the petition for certiorari shall make any material change in the status of any matter determined therein, the petitioner may, upon reasonable notice to the board or commission and other material defendants, apply to the chancellor, at the time of filing such petition, for a supersedeas, and the chancellor, in the chancellor's discretion, may grant a writ of supersedeas to stay the putting into effect of such order or judgment or any part thereof."

The Chancery Court granted the expedited hearing, which was conducted on June 18, 2007. Petitioners argued that the irregularities they set out in their petition entitled them to the relief of having the Board's recommendation vacated.[5] Metro argued that judicial review by certiorari is only appropriate for a final order, that the Parks Board had only made a recommendation, and that a final decision on the proposed Agreement had not yet been rendered by the only body authorized to make that decision, the Metropolitan Council. Metro also contended that if the court were to hold that a party is entitled to mount a judicial challenge to each and every administrative step in a multi-step process, such a party could force the indefinite postponement of any action it opposed.

After hearing argument from both sides, the court declared that it agreed with the Metropolitan Government. Its order, filed on July 16, 2007, dissolved the writs of supersedeas in order for the process to continue. The writ of certiorari was dismissed as premature because the Metro Council had not yet acted and, therefore, there was no final action to review. The dismissal of the writ of certiorari was declared to be without prejudice to the petitioners' right to file another petition for the writ once a final decision was made. The petitioners filed an appeal to this court, which was given Court of Appeals No. M2007-1701. We stayed the appeal, pending the trial court's disposition of the companion cases related to the disputed Agreement.

## IV. THE PROCESS CONTINUES

With the trial court's lifting of the writ of supersedeas, the Planning Commission was able to consider the proposed Agreement in its meeting of August 9, 2007. The planning staff made a ten-minute presentation and recommended approval of the Agreement.[6] The attorney for Ms. Walker and Ms. Richardson was among those who spoke in opposition to the agreement. After the public comment portion of the meeting was over, each member of the Planning Commission stated his or her position. A motion was then made to approve the Agreement, subject to completion of an expanded traffic study. The motion passed, four votes to three.

A condition set out in the Agreement addressed other required permitting. That condition reads, "Belmont shall have secured any zoning changes, licenses, permits, and/or approvals required to allow construction of the improvements and the Contemplated Use. Metro shall assist in these efforts as appropriate." Accordingly, Belmont applied to the BZA for a Special Exception Permit to be allowed to build the planned facilities. On June 21, 2007, the BZA conducted a public hearing to consider Belmont's application. Proponents and opponents of the Agreement addressed the BZA.

---

[5] Petitioners claimed that by refusing to allow their attorney to speak at the Parks Board meeting, the Board had acted in an arbitrary and capricious way and had violated their right to procedural due process. They further claimed that the proposed agreement between the Department of Parks and Belmont University amounted to a "public/private partnership" and that the Parks Department's Policy Manual restricts the creation of such partnerships to those public assets which are not currently being used for Parks and Recreation Services. They, therefore, argued that the Parks Board had no authority over the matter and that its action was *ultra vires.* Finally, the petitioners claimed that because the Board's approval of the final version of the Agreement involved an exchange of e-mails by Board members, the Board was in violation of the Open Meetings Act.

[6] The Commission had decided to allow one hour for public comment, with a total of thirty minutes allotted to each side, but it charged the ten minutes of the planning staff's presentation to the proponents of the Agreement, leaving that side with only twenty minutes of public comment.

-6-

The opponents who spoke included Mr. Joe Johnston, the attorney who represents Ms. Walker and Ms. Richardson, Ms. Lane, and several members of O.N.E.

At the conclusion of the meeting, the BZA determined that the application by Metro Parks and Belmont met all the requirements for a Special Exception Permit as set forth in Section 17.40.720 of the Metropolitan Code. However, it deferred action on approval of the permit to allow completion of an extended traffic and parking analysis and to give the parties the opportunity to enter into negotiations to make the lease more acceptable to the neighborhood. Metro Council members Ginger Hausser Pepper and Ludye Wallace agreed to facilitate the negotiations. On August 11, 2007 Codes Administrator Sonny West wrote a letter to the BZA recommending that the new facility be designated as a "recreation center." Prior to the next BZA meeting, O.N.E. filed an appeal, challenging the classification of the facility as a recreation center rather than as a stadium, which is not permitted in a residentially-zoned area.[7]

The next meeting of the Board of Zoning Appeals was conducted on August 16, 2007. Two separate items related to the proposed Agreement were on the meeting agenda. The first was the "Item A" appeal of the Codes Administrator's decision as to the proper classification of the proposed improvements to Rose Park. The BZA heard testimony by Mr. West as to his reasoning and arguments for and against the recreation center classification. The attorney for O.N.E. argued that the baseball field, with planned seating for between 500 and 750 spectators, should be considered a stadium because of its planned configuration and use. Belmont's attorney argued that the stadium classification should be reserved for larger facilities which can accommodate a much greater number of spectators and can create a more serious impact on the surrounding community from increased traffic and noise. Three Metro Council members also addressed the BZA with their own concerns and perspective on the question. At the conclusion of all comment and of extensive deliberation by Board members, the BZA voted 4-2 to uphold the classification established by the Zoning Administrator.

The next item on the BZA's meeting agenda was an "Item C" review of the application for a Special Exception Permit to construct the three athletic fields in Rose Park. The BZA first heard testimony from a traffic engineer with Metro Public Works, who had reviewed the new traffic study, and who stated that according to his Department's analysis, so long as Metro and Belmont complied with the conditions set out in the Agreement to handle traffic and parking issues, the additional traffic generated by activities at the new sports facilities could be safely accommodated.

The BZA then heard from Metro Council member Ginger Hausser Pepper as to the outcome of the negotiations between community members and Belmont on the issues of concern to the community, which was supplemented by a detailed written report on those negotiations. According to Council Lady Pepper, the parties were able to reach agreement on a great many of those issues. Among other things, Belmont agreed to construct additional pedestrian improvements in the park, to allow the three public schools that use the park to have first priority in scheduling for the athletic fields, and to give University scholarships to qualified students from the neighborhood. They also

---

[7]Rose Park is zoned RM20 (Multi-Family Residential, 20 units per acre). Under Metro's Zoning Code, a recreation center cannot be built in an area zoned RM20 unless a Special Exception Permit is granted. Land zoned RM20 may not be used for a stadium/arena/convention center under any circumstances.

agreed not to name the new facilities for Belmont and not to construct a chain link fence around the playing fields. However, Belmont was unable to allay neighborhood concerns about the size of the footprint of the new athletic fields, the duration of the lease, and the creation of a mechanism to ensure compliance by the University with its promises.

After Ms. Pepper's presentation, the BZA heard from a Metro Parks representative, who assured the BZA members that the Parks Department would retain sole authority to schedule all park activities, and that it would monitor Belmont's compliance with all the agreements it made about the use of the park. The Board then deliberated at length and ultimately voted 5-1 to approve the special use exception subject to nine conditions that the parties had agreed upon in negotiation. The BZA subsequently entered an order memorializing its decision.[8]

Meanwhile, a bill had been introduced in the Metro Council to approve the 40 year Property Improvement and Lease Agreement. On August 21, 2007, the Council considered it on third reading, after receipt of the Planning Commission's recommendation. At that session, the Council amended the Agreement to reflect the conditions adopted by the BZA.[9] The bill was then adopted as amended, and the lease was referred back to the Parks Board for review of the amendments.

The Mayor signed the bill on August 23, 2007. The Parks Board met on September 6, 2007, and did not object to the amendments, voting unanimously to approve the amended Agreement.[10] Representatives of Metropolitan Government and Belmont University executed the Agreement on October 26, 2007.

## V. PROCEEDINGS IN TRIAL COURT

On October 15, 2007, O.N.E. and ten of its individual members filed a petition for supersedeas and certiorari in the Chancery Court of Davidson County (Chancery Court No. 07-2310-

---

[8] Those nine conditions are stated in the BZA's order as follows: "(1) agreement (attached) with the community and Belmont to be included as part of the approval by the Board (items (1-12); (2) Metro schools to be given priority scheduling; (3) no perimeter fencing shall be chain-link fencing to be placed around the park and no parking lot entrances or fields to be gated except for security purposes as deemed necessary by Parks; (4) seating limited to 750 for the baseball field, 300 for the track/soccer area and 250 for the softball field, any additional seating must be approved by the BZA; (5) retractable netting to be provided to protect the two schools as needed; (6) schematic master plan as presented in public hearing (attached); (7) no amplified sound during normal school hours; (8) no intercollegiate games to be scheduled to begin until at least 30 minutes after normal closing hours for Carter Lawrence and Rose Park are dismissed for the day; (9) Metro schools to be given priority scheduling." The twelve items of agreement referred to as condition (1) in the BZA's order are found in a spreadsheet in the administrative record, and include items relating to scheduling, field design, safety, traffic and parking, lighting, noise, concessions, maintenance, repairs, liability, signage and the naming of fields.

[9] Belmont fully agreed to the amendments. They included a provision requiring the university to provide eight full-tuition university scholarships and two half- tuition scholarships to qualified community residents throughout the forty-year duration of the lease.

[10] Again, a request by the attorney for Ms. Walker and Ms. Richardson to speak at the meeting was denied on the ground that the agenda for the September board meeting had closed before his request was received. At the meeting, the attorney rose to speak and asked to be allowed to introduce five exhibits. They were accepted, but he was ruled out of order. Mr. Johnston then refused to return to his seat and was escorted from the building by a police officer.

II). The petition named as respondents the Metropolitan Government of Nashville and Davidson County, the Board of Zoning Appeals, the Metropolitan Board of Parks and Recreation, the Metropolitan Planning Commission, and Belmont University.

Sandra Walker and Janice Richardson, both members of O.N.E., filed a second petition for supersedeas and certiorari in their individual names at around the same time (Chancery Court No. 07-2480-II). The same respondents were named as in their first petition, with the addition of the Metropolitan Council. Because both petitions arose out of the same operative facts and law and implicated the same remedies, the trial court allowed joinder of the two petitions in an agreed order to consolidate, filed on December 5, 2007.[11]

Metro filed a motion to dismiss, arguing among other things that the claims against the Planning Commission and the Parks Board should be dismissed because those bodies did not take any "final action" subject to review under the writ of certiorari. On December 7, 2007, the Chancery Court conducted a hearing on the motion. The court determined that the claim for writ of certiorari against the various administrative agencies of Metropolitan Government had to be severed from any claim implicating the Metro Council, which as the legislative arm of Metro Government is not subject to the writ, and whose actions can only be challenged through an action for declaratory judgment. *See McCallen v. City of Memphis,* 786 S.W.2d 633, 638 (Tenn. 1990); *Fallin v. Knox County Bd. of Commissioners*, 656 S.W.2d 338, 342 (Tenn. 1983); *Bernard v. Metro Gov't of Nashville and Davidson County*, 237 S.W.3d 658, 665 (Tenn. Ct. App. 2007).

The trial court accordingly held its ruling in abeyance to give the petitioners the opportunity to sever the declaratory judgment action from the certiorari action. The petitioners subsequently filed two amended petitions in accordance with the court's ruling, a Joint Amended Petition for Writs of Certiorari and Supersedeas (which remained Chancery Court No. 07-2310-II), and a Joint Amended Petition for Declaratory Judgment and Injunctive Relief (Chancery Court No. 08-48-II).[12]

With the certiorari action in abeyance, the parties filed cross motions for summary judgment in the declaratory judgment action.[13] O.N.E., Metro Government, and Belmont University each filed Statements of Undisputed Material Facts pursuant to Tenn. R. Civ. P. 56.03. The hearing on the competing motions was conducted on March 28, 2008. The attorneys for O.N.E. and for Ms. Walker and Ms. Richardson both pointed out that on many occasions during the proceedings that led up to the filing of their petitions, representatives of Metro and of Belmont referred to the

---

[11] The agreed order was just one of several procedural events that occurred at around the same time to realign the cases challenging the lease agreement with each other. As Ms. Walker and Ms. Richardson's petitions were moving through the Davidson County Chancery Court, Part III, the petitions brought by O.N.E. were making their way through another section (Part II) of the same court. Upon the joint motion of the parties, and "in the interest of judicial economy and to avoid the possibility of inconsistent rulings on the same issues in these cases," the court ordered Ms. Walker and Ms. Richardson's petitions transferred to Part II.

[12] Consequently, O.N.E. and Ms. Walker and Ms. Richardson, collectively, will be referred to as "Petitioners" throughout the rest of this opinion.

[13] The court apparently chose to hear the declaratory judgment action before the certiorari action because a judgment for the petitioners on the declaratory judgment action would likely render the certiorari action moot.

proposed Agreement between those two entities as a partnership, both orally and in writing. They argued that the Agreement was therefore a public/private partnership operating in the name of a lease, and that as such the recommendation by the Parks Board that it be approved and the vote of the Metro Council adopting the Agreement by ordinance were *ultra vires* and should be deemed to be void *ab initio*.[14]

The attorneys for Metro and for Belmont University responded by contending that the Metro Council had the authority to enter into the lease agreement and that it exercised that authority in a lawful and reasonable manner. They further argued that just as the court only speaks through its minutes, likewise, the Council can only speak through the ordinances that it passes. They pointed out that the Council did not use the words "partner," or "partnership" in the ordinance and that the Lease Agreement specifically declares that it should not be construed as creating any kind of partnership between Metro Government and Belmont. They, therefore, argued that generic references to partnership within the context of preliminary proceedings before municipal bodies have no legal effect.

At the conclusion of the hearing, the trial court took the case under advisement. On April 23, 2008, the court filed a 24 page Memorandum and Order, which addressed in detail all the arguments raised by the petitioners' attorneys. The court held that the Metro Charter did not limit or restrict the Metro Council's authority to enter into leases through legislative action and that any limits on the authority of the Parks Board to enter into public/private partnerships did not apply to the Metro Council.

The trial court also found that implementation of the Agreement would bring numerous benefits to the children and adults of the Edgehill neighborhood, and that those benefits were reasonable justifications to support the lease agreement. The court noted that although the petitioners did not agree that those benefits were reasonable justifications, a disagreement with legislative purposes does not create a factual dispute. The court accordingly found that there were no material facts in dispute and that Metro Government and Belmont University were entitled to summary judgment as a matter of law. The petitioners appealed, and the case was designated as Court of Appeals No. M2008-1748.

The trial court subsequently conducted a hearing on the combined petition for writs of certiorari and supersedeas, after which it severed the claim against the BZA from the claim against the Parks Board and dismissed the claim against the Parks Board. The dismissed claim was docketed as Case No. 07-2480-II. The Court held that "the decisions by the Parks Board regarding the proposed 'Property Improvement and Lease Agreement' were not final decisions by this agency, but were merely recommendations to the Metropolitan Council to approve said agreement and are therefore not reviewable by this Court by writ of certiorari."[15] The appeal of that decision was

---

[14] Attorney Joseph Johnston also argued that Parks Board violated his clients' First Amendment rights to free speech and that it violated the Open Meetings Act, Tenn. Code Ann. § 8-44-101 et seq.

[15] The Planning Commission was not listed as a respondent in the trial court's order and the court did not discuss any claim against the Commission. However, the petitioners do not complain about this oversight, perhaps because in this case the role of the Planning Commission, like that of the Parks Board, was to make recommendations only. Thus,

(continued...)

-10-

designated as Court of Appeals No. M2008-01226. The certiorari claim against the BZA was allowed to proceed with a new case number in the trial court.

The claim against the BZA was premised on the arguments the BZA's classification of the proposed athletic fields as a recreational center did not meet the definition of recreational center found in the Metro Zoning Code, and that the BZA erred in approving a Special Use Exception permit to allow the construction of athletic fields in Rose Park. In a 21 page Memorandum and Order, filed on August 28, 2008 the trial court rejected these arguments, and dismissed the petition on summary judgment. The petitioners filed a timely notice of appeal, which was designated as Court of Appeals No. M2008-02218.

## VI. THE WRIT OF CERTIORARI ACTIONS

Actions for certiorari and those for declaratory judgment are distinct forms of action to which a petitioner may have recourse, depending on the nature of the decision maker involved or of the governmental action from which the petitioner seeks relief. An action for certiorari is the proper remedy for a party aggrieved by the final order or judgment of an administrative body which has acted in a judicial or a quasi-judicial capacity to apply existing law to the facts of a particular case. Tenn. Code Ann. § 27-9-101 et seq.; *McCallen v. City of Memphis*, 786 S.W.2d at 638; *Fallin v. Knox County Bd. of Commissioners,* 656 S.W.2d at 342.

The distinction between declaratory judgment actions and those brought as common law writ of certiorari is that "determinations . . . [that] are administrative determinations, judicial or quasi-judicial in nature, and are accompanied by a record of the evidence produced and the proceedings had in a particular case" are reviewable by certiorari, "whereas, the enactment of ordinances or resolutions, creating or amending zoning regulations, is a legislative, rather than an administrative, action and is not ordinarily accompanied by a record of the evidence, as is the case of an administrative hearing." *Fallin v. Knox County Bd. of Commissioners,* 656 S.W.2d at 342-43. Legislative actions are not reviewable by common law writ of certiorari. *Id.* The test for determining whether the governmental action is legislative or administrative, also called quasi-judicial is whether it "makes new laws or executes one already in existence." *Moore & Associates, Inc. v. West*, 246 S.W.3d 569, 575 (Tenn. Ct. App. 2005) (quoting *McCallen v. City of Memphis*, 786 S.W.2d at 640).

### A. Judicial Review of Actions by the Parks Board

The claims in the common law writ of certiorari actions involve, *inter alia*, challenges to the Parks Board's decision in recommending the lease. These actions were brought pursuant to Tennessee Code Annotated § 27-8-101, which governs the extraordinary remedy of common law writ of certiorari, and Tennessee Code Annotated § 27-9-101 et seq., which sets out the procedures to be applied in judicial review, by common law writ of certiorari, of decisions by boards and commissions. Tennessee Code Annotated § 27-9-101 provides:

---

[15](...continued)
the court's logic in dismissing the claim against the Parks Board applies equally to the Planning Commission.

Anyone who may be aggrieved by any *final order or judgment* of any board or commission functioning under the laws of this state may have the order or judgment reviewed by the courts, where not otherwise specifically provided, in the manner provided by this chapter. *(emphasis added).*

The words of the statute clearly limit judicial review of actions by administrative bodies to final orders or judgments. Accordingly, this court has construed Tenn. Code Ann. § 27-9-101 to mean that actions by boards or commissions that are not final orders or judgments are not subject to judicial review under the common law writ of certiorari. *See State Dept. of Commerce v. FirstTrust*, 931 S.W.2d 226, 228-229 (Tenn. Ct. App. 1996) (holding that a subpoena *duces tecum* issued in conjunction with the Insurance Commissioner's Order of Investigation does not amount to a final order subject to judicial review); *Isom v. Knox County Retirement & Pension Board and Knox County, Tennessee,* No. 03A01-9708-CH-00333, 1998 WL 136556, at *1 (Tenn. Ct. App. March 27, 1998) (no Tenn. R. App. P. 11 application filed) (holding that employee's claim for refund of offsets he had previously paid was governed by Tenn. Code Ann. § 27-9-101 and, finding that the retirement and pension board had not yet acted on the employee's claim, dismissing the common law writ of certiorari action since no final order or judgment by the board had been entered).

The language "final order or judgment" in Tenn. Code Ann. § 27-9-101 must also be construed in the context of Tenn. Code Ann. § 27-8-101, which creates another requirement for the writ, by providing that,

The writ of certiorari may be granted whenever authorized by law, and also in all cases where an inferior tribunal, board, or officer *exercising judicial functions* has exceeded the jurisdiction conferred, or is acting illegally, when, in the judgment of the court, there is no other plain, speedy, or adequate remedy. *(emphasis added).*

The requirement that, to be subject to review by the common law writ of certiorari, a board's decision must be the result of its exercise of judicial functions explains the use of the words "order" and "judgment" in Tenn. Code Ann. § 27-9-101 and in § 27-9-102 (requiring that a petition for writ be filed within sixty days from the entry of the "order or judgment"). Those terms are, of course, generally used to describe actions by courts. It is instructive to note that cases such as *State Dept. of Commerce v. FirstTrust*, 931 S.W.2d 226, discussed above, involved an interlocutory action (issuance of subpoenas) in a quasi-judicial proceeding. The term "interlocutory," itself, implies an action taken during the pendency of a matter by the entity that will have final decision-making authority in the matter. *See, e.g.*, Tenn. R. App. P. 9 (dealing with appeals of interlocutory orders by trial courts).

That is not the situation here, because the Parks Board does not have decision-making authority with regard to the lease of Metro property. Only the Metropolitan Council has authority to lease property owned by Metro. Metropolitan Charter, §§ 2.01 and 3.06. While the Parks Board

has authority to supervise, control and operate the city's recreation system, it is not authorized to render any decision on a lease of land.[16]

The Parks Board's recommendation was not final in that it was not the decisive governmental act authorizing or taking any specific action. A number of federal cases and cases from other jurisdictions have held that a recommendation by an administrative body is not a final order because further executive or legislative action is required before any final action can be taken. *See Dalton v. Spencer,* 511 U.S. 462 (1994) (commission's recommendation that the Philadelphia Naval Shipyard be closed was not a final decision subject to judicial review, because ultimate decision on closure rested with the President); *Public Citizen v. Dept. of Health and Human Services*, 795 F. Supp. 1212, 1221-1222 (D.D.C. 1992) (recommendation for new FDA rules does not create a justiciable question because the final decision on those rules rests with Congress); *Outgamie County v. Smith*, 155 N.W.2d 639, 644-645 (Wis. 1968) (recommendation of site of new college campus not subject to review because the Governor and other state officials were charged with making a final decision on that site).

As the trial court herein found, the decision the petitioners seek to challenge was not a final order or judgment. In fact, and perhaps more importantly, the Parks Board's recommendation of the proposed lease was not even an order or a judgment, much less a final one. *See Paris v. City of Lebanon Personnel Review Board,* No. 01A01-9702-CH-00054, 1997 WL 607519 at *4 (Tenn. Ct. App. Oct. 3, 1997) (no Tenn. R. App. P. 11 application filed) (stating that a letter of termination from the police chief was not an order or judgment). It was merely a recommendation on a matter of public policy.

Finally, whether the Parks Board's decision to recommend the proposed lease was final or not, it is simply not the kind of administrative decision that is subject to judicial review under the common law writ of certiorari. It was not the product of a judicial or quasi-judicial proceeding, and, thus, does not meet the prerequisites in Tenn. Code Ann. § 27-8-101. In deciding whether to recommend the lease, the Board was performing a policy-making function. Nothing in the decision to recommend the proposed lease implicated the exercise of a judicial function. *See Ussery v. City of Columbia*, No. M2008-01113-COA-R3-CV, 2009 WL 1546382, at *16 (Tenn. Ct. App. June 1, 2009) (Tenn. R. App. P. 11 application filed Aug. 31, 2009) (holding that writ of certiorari is not available under Tenn. Code Ann. § 27-8-101 where the action challenged did not involve an inferior tribunal, board, or officer exercising judicial functions.) As explained above, administrative or quasi-judicial governmental action involves the execution of existing law, *i.e.* applying the facts of

---

[16] In fact, the Metro Charter does not clearly require that a lease of park land be referred to the Parks Board for its opinion, input, or recommendation. Metropolitan Charter, Chapter 10, Sec 11.1002 (authorizing the Parks Board to make a recommendation for the acquisition or disposition of land managed by it). Metro appears to take the position that the Parks Board's recommendation was part of the required procedure. Since that is the procedure that was followed, the question of whether it was necessary need not be decided. Metro also interprets the same Charter provision as requiring that any recommendation by the Parks Board regarding park land use must be referred to the Planning Commission. Again, the interpretation of that provision is not at issue. Any proposal involving the construction of a building or other structure on Metro land must be submitted to the Planning Commission for its approval or disapproval. *See* Metropolitan Charter, Sec. 11.505. If a proposal is approved by the Planning Commission, it is then submitted for a vote to the full Metro Council. If the Planning Commission disapproves of a proposal, it must inform the Metro Council of its reasons. However, even if the Planning Commission disapproves, the Metro Council may override any such disapproval by the vote of a majority of its membership. *Id*.

-13-

the matter before the board to an ordinance or other legal rule. *Moore & Associates, Inc. v. West*, 246 S.W.3d at 576.

This court has also held that a deputy police chief's decision denying former officers' requests for certain retirement benefits was not made by an inferior tribunal, board, or officer exercising judicial functions and, consequently, that decision was not subject to challenge by way of common law writ of certiorari. The court explained that, "[t]he statutory scheme implementing common law certiorari 'plainly presupposes that a judicial or quasi-judicial proceeding is the subject of review and that a 'record' of evidence, common in such proceedings, is available for certification to the reviewing court.'" *Bernard v. Metropolitan Government of Nashville and Davidson County*, 237 S.W.3d 658, 664 (Tenn. Ct. App. 2007)(quoting *Fallin v. Knox County Bd. of Comm'rs*, 656 S.W.2d at 341).

Because the Parks Board did not act in a judicial or quasi-judicial capacity, and because its recommendation did not constitute a final order or judgment, we affirm the trial court's dismissal of the claims against the Board which were brought under the common law writ of certiorari.

## B. Review of the Actions of the BZA

The proper vehicle by which to seek judicial review of decisions of the local board of zoning appeals is the common law writ of certiorari, because such an action is administrative or quasi-judicial in nature, since it involves application of an existing zoning code to a particular set of facts. *McCallen v. City of Memphis*, 786 S.W.2d at 640; *Moore & Associates*, *Inc. v. West*, 246 S.W.3d at 576; *City of Brentwood v. Metropolitan Bd. of Zoning Appeals*, 149 S.W.3d 49, 57 (Tenn. Ct. App. 2004);*Weaver v. Knox County Bd. of Zoning Appeals*, 122 S.W.3d 781, 783-84 (Tenn. Ct. App. 2003); *Wilson County Youth Emergency Shelter, Inc. v. Wilson County*, 13 S.W.3d 338, 342 (Tenn. Ct. App. 1999). Boards of zoning appeals generally engage in enforcing, applying, or executing law already in existence. *Weaver*, 122 S.W.3d at *784;Wilson County Youth Emergency Shelter,* 13 S.W.3d at 342.

The scope of review under the writ of certiorari is quite limited. *Willis v. Tennessee Dep't of Correction*, 113 S.W.3d 706, 712 (Tenn. 2003). In common law of writ of certiorari proceedings, courts review a lower tribunal's decision only to determine whether that decision maker exceeded its jurisdiction, followed an unlawful procedure, acted illegally, arbitrarily, or fraudulently, or acted without material evidence to support its decision. *Petition of Gant*, 937 S.W.2d 842, 844-45 (Tenn. 1996)(*quoting McCallen v. City of Memphis*, 786 S.W.2d at 638; *Fallin v. Knox County Bd. of Com'rs*, 656 S.W.2d at 342-43; *Hoover Motor Exp. Co. v. Railroad & Pub. Util. Comm'n.*, 261 S.W.2d 233, 238 (Tenn. 1953); *Lafferty v. City of Winchester*, 46 S.W.3d 752, 758-59 (Tenn. Ct. App. 2001); *Hoover, Inc. v. Metropolitan Bd. of Zoning Appeals,* 955 S.W.2d 52, 54 (Tenn. Ct. App. 1997); *Hemontolor v. Wilson Co. Bd. of Zoning Appeals*, 883 S.W.2d 613, 616 (Tenn. Ct. App. 1994).

Under the certiorari standard, courts may not (1) inquire into the intrinsic correctness of the lower tribunal's decision, *Arnold v. Tennessee Bd. of Paroles*, 956 S.W.2d 478, 480 (Tenn. 1997); *Powell v. Parole Eligibility Rev. Bd.*, 879 S.W.2d 871, 873 (Tenn. Ct. App. 1994); (2) reweigh the evidence, *Watts v. Civil Service Board for Columbia*, 606 S.W.2d 274, 277 (Tenn. 1980); *Hoover,*

*Inc. v. Metro Bd. of Zoning App.*, 924 S.W.2d 900, 904 (Tenn. Ct. App. 1996); or (3) substitute their judgment for that of the lower tribunal. *421 Corp. v. Metropolitan Gov't of Nashville*, 36 S.W.3d 469, 474 (Tenn. Ct. App. 2000). It bears repeating that common law writ of certiorari is simply not a vehicle which allows the courts to consider the intrinsic correctness of the conclusions of the administrative decision maker. *Powell*, 879 S.W.2d at 873; *Yokley v. State*, 632 S.W.2d 123, 126 (Tenn. Ct. App. 1981); *Moore & Associates*, *Inc. v. West*, 246 S.W.3d at 574.

Further, illegal, arbitrary or fraudulent actions include: (1) the failure to follow the minimum standards of due process; (2) the misrepresentation or misapplication of legal standards; (3) basing a decision on ulterior motives; and (4) violating applicable constitutional standards. *Harding Academy v. Metropolitan Gov't of Nashville and Davidson County*, 222 S.W.3d 359, 363 (Tenn. 2007)(citing *Hoover, Inc. v. Metro Bd. of Zoning Appeals*, 924 S.W.2d at 904). The same limitations apply to the scope of review of the appellate courts, which "is no broader or more comprehensive than that of the trial court with respect to evidence presented before the Board." *Watts v. Civil Service Board for Columbia*, 606 S.W.2d at 277

1. The Classification of the Playing Fields

The petitioners first argue that the BZA erred by classifying the proposed athletic fields as a "Recreation Center" rather than as a "Stadium." The Metropolitan Code defines a Recreation Center as "recreational facilities such as community centers, playgrounds, parks, swimming pools and playing fields that are available to the membership of a club or the general public." M.C.L. § 17.04.060(b).[17] The Code does not contain a definition for a Stadium. It declares, however, that when a term is not defined, "the definition found in the most current edition of Webster's Unabridged Dictionary shall be used. The zoning administrator shall have the right to interpret the definition of the word."

Webster's Dictionary defines a stadium as "a terraced structure with seats for spectators ... typically built in the shape of a long, narrow horseshoe; a large unroofed structure with tiers of seats for spectators built in various shapes . . . and enclosing a field used for sports events (as baseball, football, track and field)." In his letter of August 11, 2007, Metro Zoning Administrator Sonny West acknowledged that the dictionary definition could apply, but "there is no statement as to number of seats that is required to become a stadium rather than a playing field."

Mr. West noted that Metro had previously issued stadium permits for Vanderbilt Stadium, LP Field, Greer Stadium, Hale Stadium, Sommet Center and Municipal Auditorium, all of which are much larger venues than the one proposed for Rose Park, with seating for far larger crowds. Conversely, at least 25 of Metro's 94 parks contain one or more baseball fields, some of which could conceivably meet the dictionary definition, but none of which have been required to obtain a stadium permit. These include the current baseball field in Rose Park, which has concrete bleachers that can accommodate hundreds of spectators, and a field in Shelby Park with similar features which Belmont uses for its home games when Greer Stadium is not available. Mr. West concluded that

---

[17]The record shows that Rose Park already contains a community center, playgrounds, a swimming pool and a playing field, all open to the public. The proposed Agreement would not eliminate these, but would improve one playing field and add two new ones.

the proposed facilities ". . . should be classified as a 'recreation center' because the seating capacity and structures contemplated do not give rise to being classified as a 'stadium.'"

At the BZA meeting of August 16, 2007, the attorney for O.N.E. challenged Mr. West's conclusion. He argued that the question of size was irrelevant when determining the proper classification for a sports facility. He noted among other things that when Belmont's baseball team plays away games at other universities, it is almost always at a facility denominated as a stadium, and he pointed out that many quite small facilities are called stadiums. He cited examples, including a 314 seat baseball field at the Indiana Institute of Technology.

The attorney for Belmont argued that size of a facility is an essential component of its proper classification. He acknowledged that a facility with the potential to draw thousands of vehicles and thousands or possibly tens of thousands of spectators for a single sporting event could overwhelm a residential area with noise and traffic, but he noted that Belmont's proposed facility was much smaller, with maximum anticipated seating of 750 at the baseball field, 250 at the softball field, and 300 at the soccer field and surrounding track. He also cited one statute, Tenn. Code Ann. § 7-3-202(2), which defines a "municipal stadium" as a structure with seats for not less than thirty thousand (30,000) spectators.

Belmont's attorney bolstered his argument by citing Metro's Zoning Ordinance and the Zoning District Land Use Table which forms a part of it. See M.C.L. 17.08.030. That table includes a list of recreational and entertainment uses, matched with the zoning districts in which they are permitted. A recreation center is allowed in five out of six categories of residential district if a special exception is obtained (RS80 through RS 3.75, R80 through R6, RM2 through RM20, RM40 through RM60, and MHP). "Stadium arena/convention center" forms a single category in the Land Use Table. Such structures are only permitted in certain multiple-use (not strictly residential) districts. Since the Table groups "stadium," together with "arena" and "convention center," the attorney argued that it was necessary to conclude that for zoning purposes, the stadium designation should be reserved for large structures designed to accommodate very large crowds.

Following presentations, there was vigorous discussion among Board members as to the proper classification for the proposed facilities.[18] Finally, a board member made a motion to overrule the zoning administrator and declare the proposed facility a stadium. The motion was seconded, but was defeated. A motion to uphold the ruling of the zoning administrator was then made. It was seconded and was passed 5-1.

In its Memorandum and Order, the Chancery Court noted the limited scope of review that the court was entitled to exercise under the writ of certiorari. The court also noted the strong presumption of validity favoring the actions of a zoning agency when applying or interpreting its own ordinances. *See Harding Academy v. Metro Gov't of Nashville and Davidson County,* 207 S.W.3d 279, 286 (Tenn. Ct. App. 2006). The court cited an unpublished opinion of this court to

---

[18]A board member asked Mr. West at one point how big a recreation center had to be before it became a stadium. He responded that he would probably draw the line at "about 5,000 ...it wouldn't be 314 nor would it be 30,000," indicating that in his opinion facilities for fewer than 5,000 spectators would not normally fall into the stadium category.

further explain the framework for its decision. We stated in that opinion that where the interpretation of an ordinance in a close case or is "fairly debatable," it is of no consequence that the evidence might support an opposite result, because the court may not substitute its judgment for that of the Board of Zoning Appeals. *Brunetti v. Board of Zoning Appeals for Williamson County*, No. 01A01-9813-CV-00120, 1999 WL 802725 at *5 (Tenn. Ct. App. October 7, 1999)(no Tenn. R. App. P. 11 application filed).

The court then turned to the transcript of the BZA meeting and observed that the members of the BZA diligently examined the current use of Rose Park, the decision and reasoning of the Codes Administrator, and the description of the proposed ball fields, including the number of seats planned for each field. The court noted that the BZA also discussed the definition of "recreation center" in the Metro Code, the definition of "stadium" in Webster's Unabridged Dictionary, the significance of the placement of "stadium" in the same category of the Land Use Table as "arena" and "convention center," and the information provided by O.N.E.'s counsel regarding the number of seats in various venues throughout the country that carry the word stadium in their names. Only then did the BZA put the question to the vote that led to this appeal. The trial court concluded that,

> . . . it is fairly debatable whether Belmont's proposed fields at Rose Park would constitute a recreational center. There is a reasoned basis for the conclusion that the improvements will be used for a recreational center and for the conclusion that they will not. However, the court need not decide that issue. The BZA's decision ...was based on sufficient evidence and was a reasonable exercise of judgment. Therefore, this decision was not arbitrary, capricious or unlawful. Having found that the BZA was within its authority to accept the zoning administrator's classification of the improvements as a recreation center, O.N.E.'s argument that they must be classified as a stadium must fail.

The appellants argue on appeal that the proposed use of the baseball field by Belmont rendered its classification as a recreation center arbitrary and capricious.[19] We disagree. The Zoning Administrator's, and subsequently the BZA's, interpretation of "recreation center" in the local zoning ordinance is consistent with the reasoning presented. Nothing in that interpretation or in the proceedings before the BZA would give this court a basis to set aside the BZA's decision.

As the trial court herein recognized, courts give deference to local government officials in decisions regarding land use.

> [O]ne principle that infuses the approach of Tennessee courts to judicial review of local land use decisions, whether those decisions are legislative or administrative in

---

[19] They assert that not a single NCAA baseball team plays intercollegiate games at a field which is called a recreation center. Of course, what a facility is named is not necessarily, and not usually, the same as its zoning classification. They also cite the Zoning Administrator's classification of similar facilities at Vanderbilt University and David Lipscomb University as stadiums, and contend that, "There is not a principled distinction between those facilities and what is proposed for Rose Park." We disagree. The baseball fields at those universities are located on their respective campuses. It is unlikely that they could meet the definition of a recreation center, because among other things, they are only "open to the public" to the extent that the universities themselves wish to make them available for public use.

nature, is that "the court's primary resolve is to refrain from substituting its judgment for that of the local governmental body." *McCallen*, 786 S.W.2d at 641. There exists a public and judicial policy that favors permitting the community decision-makers closest to the events, who have been given broad powers in the area, to make zoning and land use decisions. Consequently, courts give wide latitude to local officials who are responsible for implementing zoning ordinances, are hesitant to interfere with zoning decisions, and will refrain from substituting their judgments for that of the local governmental officials. *Lafferty*, 46 S.W.3d at 758; *Hoover, Inc.*, 955 S.W.2d at 54; *Whittemore v. Brentwood Planning Comm'n.*, 835 S.W.2d 11, 15 (Tenn. Ct. App. 1992).

*Moore & Associates*, *Inc. v. West*, 246 S.W.3d at 575.

From our examination of the administrative record, it is clear that both parties presented information and arguments to support their respective points of view. The BZA members then debated the question at length, and their discussion shows that they understood, and fully considered, the arguments for both sides. The BZA had the authority and discretion to adopt a reasonable definition of the zoning code, and its application herein was consistent with the facts of the situation. Consequently, the trial court was correct to conclude that the BZA's decision was not arbitrary, capricious or unlawful, but rather was founded on a course of reasoning applied to material evidence in the record. We affirm the trial court's determination.

2. The Special Exception Permit

Petitioners also argue that the trial court erred in denying relief from the BZA's grant of a Special Exception Permit for the proposed recreation center. According to M.C.L. 17.16.150(A), a special exception permit "shall not be considered an entitlement, and shall be granted by the board of zoning appeals only after the applicant has demonstrated to the satisfaction of the board that all of the required standards are met." Those standards relate to compliance with regulations, integrity of adjacent areas, design and architectural compatibility, protection of natural features, historic preservation, traffic impact and hazard protection. They are set out in subsections A.-J. of M.C.L. 17.16.150(A).[20]

On appeal Petitioners raise both substantive and procedural objections to the award of the special exception permit. The substantive objections focus on the question of "integrity of adjacent areas," a standard set out as follows in M.C.L. 17.16.150(C):

A special exception permit shall be granted provided that the board finds that the use is so designed, located and proposed to be operated that the public health, safety and welfare will be protected. The board shall determine from its review that adequate public facilities are available to accommodate the proposed use, and that approval of the permit will not adversely affect other property in the area to the extent that it

---

[20]Additionally, M.C.L. 17.16.220(C) contains setback, landscape buffer, and driveway access standards for a special exception permit which are specific to recreation centers. There is no dispute as to Belmont's compliance with these standards.

will impair the reasonable long-term use of those properties.  The board may request a report from the metropolitan planning commission regarding long range plans for land use development.

Petitioners note that there is widespread neighborhood opposition to the proposed plan, based on potential scheduling problems, noise, lights at night, traffic and parking and overall interference with the surrounding neighborhood.  They conclude that these constitute adverse effects which should have compelled the BZA to reject the application for a Special Exception Permit.  However, there were also neighbors who spoke in favor of the plan.[21]

The question, however, is not about the neighbors' preferences.  The BZA cannot base its decisions on the opinions of neighbors; instead, it must decide, based on evidence presented, whether the application meets the legal requirements.

"[w]here a petitioner for a zoning permit has met all the requirements of the applicable zoning resolution, and where the zoning authority denies the permit based on reasons other than the petitioner's compliance with the resolution, the [zoning authority's] action in denying the permit is arbitrary and unreasonable."  In other words, a board member cannot vote to deny an application when the board member believes the applicant has met the necessary zoning requirements.  Further, when an applicant has complied with the requirements of the ordinance, an administrative body may not deny the permit because of concerns of neighboring landowners.

*Hoover, Inc. v. Metro Bd. of Zoning App.*, 924 S.W.2d at 905 *(citations omitted).  See also Brooks v. Fisher*, 705 S.W.2d 135, 138 (Tenn. Ct. App. 1985).  The opinion of neighbors as to the future impact of the development and use envisioned herein is not proof of such impact; neither are their wishes, whether in favor or against the proposed changes to the park.

The record shows that during the entire course of the proceedings to win approval of the Agreement, Belmont agreed to a number of proposals suggested by members of the community (and by O.N.E. itself) which were designed to address and ameliorate the concerns expressed by the opponents of the Agreement. Negotiations resulted in Belmont agreeing to make additional changes in the design and usage of the new facilities in order to make them more acceptable to the neighborhood.  The BZA then adopted these and other agreed-upon changes at its second meeting, on August 16, 2007, and made them conditions for the grant of the Special Exception Permit.

The modifications to the original Agreement included giving Metro Parks sole authority over scheduling of the playing fields, giving Metro schools priority in such scheduling, and holding back the start of Belmont games until at least thirty minutes after the end of the normal school day.

---

[21] Among those were Reverend Vincent Campbell, whose church is located directly across the street from Rose Park.  He stated that Rose Park was not fully utilized by community members, included members of his own church, because it has become a haven for prostitution, drugs and gangs.  He expressed a belief that the increased foot traffic the proposed development would bring to the park would make it safer for everybody who used its facilities.  He also suggested that much of the opposition to the project stemmed from community suspicions about Belmont's intentions, and distrust that it would actually honor the promises it made, but that he himself had found university officials to be very open and very responsive to his concerns and to those of the community at large.

Belmont also agreed to minimize construction disruption on the schools and community, not to use amplified sound equipment during normal public school hours or after 10:00 p.m. at night, to turn off field lighting no later than 10:30 p.m. each night, to clean the grounds after using them, to comply with all the provisions of the traffic impact study, not to increase the number of parking spaces requested, to install retractable netting to prevent balls from breaking windows, and to refrain from placing chain link fencing around the park.

The modified Agreement also included provisions calculated to have a beneficial impact on public health, safety or welfare. Among these were the promised construction of new pedestrian walkways in Rose Park with security lighting, construction of a new concessions booth dedicated exclusively to community use, and making the playing fields convertible for use by children. Belmont and Metro also agreed to dedicate lease payments to programs at the Easley Community Center and to the use of the two public schools adjoining the park, and Belmont agreed to provide eight full-tuition and two half-tuition University scholarships to disadvantaged neighborhood students, and to offer free course auditing privileges to Edgehill senior citizens.

Thus, before the BZA gave its final approval to the special exception permit, Belmont and Metro had agreed to make significant changes to its proposal in order to reduce or eliminate the potential adverse effects identified by those opposing the Agreement, and most of those changes were included as conditions of the grant of the permit.

Contrary to O.N.E.'s argument, we have found substantial and material evidence in the record to support the BZA's decision to grant a Special Exception Permit, because the terms of the grant include reasonable conditions to protect the public health, safety and welfare, and to make sure that the construction of the three playing fields will not adversely affect other property in the area. Based on our review of the record, we cannot find, and it is not alleged, that the BZA failed to follow the minimum standards of due process; misrepresented or misapplied legal standards; based its decision on ulterior motives; or violated applicable constitutional standards.

As we stated above, a court reviewing a petition for writ of certiorari may not reweigh the evidence or substitute its judgment for that of the administrative body whose decision has been challenged. We accordingly affirm the trial court.

3. The Board's Order

O.N.E. also raised a procedural argument in the trial court to challenge the BZA's decision. It asserted that the BZA's order of August 21, 2007 was fatally defective because it did not include specific findings of fact, as required by Section 17.40.320 of the Metropolitan Code. That section reads,

> An approval of a special exception land use by the board of zoning appeals shall state the section of this title under which the permit was considered, and findings of fact relating to the applicable approval standards. In the case of a denial, the findings of fact shall specifically identify the standards not satisfied.

The trial court did not find O.N.E.'s argument persuasive. The court held that while specific findings of fact might have helped the court better understand the basis for the BZA's decision, the absence of such findings did not invalidate the order, since the court was not precluded from examining the administrative record, including the transcripts of the BZA's meetings, to reach such an understanding. The court stated that after conducting its examination of the record, it "found sufficient material evidence to conclude that the BZA did not act illegally, arbitrarily, or fraudulently, did not exceed its jurisdiction and did not violate any procedural or substantive due process rights." The court also noted that substantial compliance with the procedural aspects of the zoning code is generally considered sufficient. *Clapp v. Knox County*, 273 S.W.2d 694, 698 (Tenn. 1954); *Morrow v. Babbitt*, 943 S.W.2d 384, 389 (Tenn. Ct. App. 1996).

O.N.E. raises the same argument on appeal that it raised at trial. It cites *Hoover v. Metropolitan Board of Zoning Appeals*, *supra*, in which this court stated that "a reviewing court can not determine whether the decision of an administrative body is supported by material evidence unless the administrative body makes findings of facts setting forth the reasons for its decisions." 924 S.W.2d at 905. In the *Hoover* case, the Board of Zoning Appeals denied plaintiff Hoover a conditional use permit to operate a quarry.

However, there are significant distinctions between the *Hoover* case and the one before us. The primary difference is that in *Hoover*, four of the five BZA members present at the meeting stated that Hoover had met the legal conditions required to obtain the conditional use permit it sought, while two of the BZA members abstained on the vote, evidently in response to pressure from neighbors opposed to the quarry, thus denying Hoover the four concurring votes necessary for approval of a conditional use permit.

As this court said, "The denial was by operation of law. It had nothing to do with whether Hoover had met the specific or the general requirements." We held that the BZA should not be allowed to use abstention as a means of circumventing its legal responsibilities, which include the requirement that "[i]n the case of a denial, the findings of fact shall specifically identify the standards not satisfied."

By contrast, in the present case the BZA considered the concerns of O.N.E. and the general community, and incorporated many of O.N.E.'s suggestions and demands. The administrative record includes the entire transcript of the two BZA meetings, including all the testimony, the Board's discussion of the effect of Belmont's proposed improvements on the surrounding area, and statements by individual members of the Board indicating that they believed that those improvements would have a positive impact. It is beyond dispute that the BZA considered the facts of the application and the relevant legal requirements. In their individual statements, the members of the Board expressed the reasons why they voted the way they did. Thus, although the BZA's order may not have included specific findings of fact, its "approval" did.

Thus, even though the trial court noted that the Board's findings "may appear disjointed and scattered throughout their deliberations," and that "their conclusions may appear in less than succinct fashion," it was able to conclude after its review of the entire transcript and the technical record that there was sufficient material evidence to support the BZA's decision. We have conducted a similar review, and we agree. In sum, even though it would have been preferable for the BZA to

include findings of fact in its order of August 21, 2007, in accordance with Section 17.40.320 of the Metropolitan Code, the absence of such findings does not require reversal of the Board's decision in this case.

## VII. THE DECLARATORY JUDGMENT ACTIONS

As we noted above, a petition for writ of certiorari is the proper vehicle for judicial review of the actions of a governmental body performing an administrative or quasi-judicial function, while an action for declaratory judgment is the proper remedy to be used by a party who wishes to invalidate an ordinance, resolution, or other enactment by a legislative body, such as the legislative authority of a county or city. Tenn. Code Ann. § 29-14-101 *et seq*.; *McCallen v. City of Memphis*, 786 S.W.2d at 640; *Fallin v. Knox County Bd. of Commissioners,* 656 S.W.2d at 342; *Nance v. City of Memphis*, 672 S.W.2d 208, 210 (Tenn. Ct. App. 1983). Despite this distinction, the scope of judicial review is similarly narrow in both types of cases.

Our Supreme Court has stated, "[w]hile this court recognizes the statutory, procedural distinction between common law certiorari and declaratory judgment, there is no sound logic to maintain different standards of substantive review. Whether the action by the local governmental body is legislative or administrative in nature, the court should refrain from substituting its judgment for the broad discretionary authority of the local governmental body. An invalidation of the action should take place only when the decision is clearly illegal, arbitrary, or capricious." *McCallen v. City of Memphis,* 786 S.W.2d at 641-642.

Further, "[w]hen the act of a local governmental body is legislative, judicial review is limited to 'whether any rational basis exists for the legislative action and, if the issue is fairly debatable, it must be permitted to stand as valid legislation.'" *McCallen v. City of Memphis,* 786 S.W.2d at 640 (*citing Keeton v. City of Gatlinburg*, 684 S.W.2d 97, 98 (Tenn. Ct. App. 1984)). *See also McCarver v. Insurance Co. of State of Pennsylvania,* 208 S.W.3d 380, 385 (Tenn. 2006); *Fallin v. Knox County Bd. of Commissioners*, 656 S.W.2d at 342; *Stalcup v. City of Gatlinburg*, 577 S.W.2d 439, 442 (Tenn. 1978).

Thus, as for the substance of the ordinance approving the Agreement, our review is limited to "whether any rational basis exists for the legislative action." The record is replete with examples of benefits that will inure to the children and adults of the Edgehill community from Council's adoption of the Agreement, including specific language in the Agreement itself. Simply because Petitioners do not agree that those benefits justify approval does not implicate the Council's authority to determine the public interest. Nor does it allow this court to substitute its judgment for that of the local governmental governing body. We find that there exists a rational basis for approval of the Agreement.

In this appeal, Petitioners' intended goal is to have this court vacate the Metropolitan Council's approval of the Property Development and Lease Agreement. Their arguments, however, do not focus on the actions of the Metro Council itself, nor on the substance of the ordinance and lease, but rather on the preliminary hearings before the Parks Board which preceded the Council's final vote. The first is substantive, while the second is procedural

## A. A Lease or A Public/Private Partnership?

Petitioners contend that the Lease Agreement is in actuality a public/private partnership and that Metro Parks Policy § 3000.29 allows the Parks Board to enter into such agreements only when unused or undeveloped park land is involved. They conclude that the Parks Board's recommendation that the Agreement be approved was beyond the scope of its authority. Therefore, they argue, everything that came after the Parks Board's recommendation, including the Metropolitan Council's approval of the agreement, was also *ultra vires.*

This argument must fail for two reasons: first, the Agreement was entered into by Metro Government acting through Metro Council and, second, there is no basis for characterizing the legal status of the Agreement as anything other than what it purports to be.

As the trial court found, Metro is expressly authorized to lease its real property by ordinance, the Metro Council is the entity authorized to agree to such a lease, and the Council is not bound by any limitation placed upon the Parks Board. The trial court also noted that the title of the Agreement declares it to be a lease, or more precisely, a Property Improvement and Lease Agreement. By its terms, Metro will retain ownership of Rose Park and will lease a portion of the property to Belmont for 40 years. Belmont will make annual lease payments to Metro.

Metro's ordinance approving the Agreement does not make any reference to any sort of partnership. The Agreement itself states that "[n]othing in this Agreement is intended to or shall be interpreted to create a joint venture or partnership between Metro and Belmont or make Metro the partner of Belmont or constitute either the agent of the other..," and further, that "Belmont shall be acting as a lessee and independent contractor on Metro's behalf." Casual statements made during the lengthy process cannot overcome the Council's stated intent nor the content of the document that was approved by Council. Even if such casual statements made outside the Council's formal action could be considered, as the trial court noted, "[w]ell recognized principles of statutory construction provide that when a statute's text and legislative history disagree, the text controls." *BellSouth Telecommunications, Inc. v. Greer*, 972 S.W.2d 663, 674 (Tenn. Ct. App. 1997).

We must accordingly reject the argument that any references to a "partnership" or even to a "public/private partnership" made by various officials of Belmont and Metro during the course of the lengthy and multi-step process that ultimately resulted in the approval of the Agreement create a question as to the Agreement's legal nature or its validity.

## B. Proceedings Before the Park Board

The Petitioners also argue that alleged irregularities in the conduct of the meetings before the Parks Board rendered the subsequent action by the Metropolitan Council invalid. They contend that the Parks Board denied their attorney the right to speak at its meetings in reliance on an invalid rule, and that by conducting a small portion of its business by e-mail, the Board violated the Open Meetings Act. The petitioners argue that even an act which a municipality is authorized to do may be *ultra vires* if it is not done "in the manner prescribed by its charter or by the statute under which it is attempting to act." *City of Lebanon v. Baird,* 756 S.W.2d 236, 242 (Tenn. 1988).

In *City of Lebanon v. Baird* the city council entered into a contract for the purchase of land through the adoption of two separate resolutions: the first authorized the Mayor to apply for a federal grant to acquire funds for the purchase of the land, and the second allowed him to use those funds together with the city's unappropriated funds to purchase the property. The Council did not enact an ordinance, as it is required by the city charter to do in order to exercise its power to enter into contracts or to acquire land, and no public notice was given by any form of publication that those resolutions were under consideration.[22] The Tennessee Supreme Court ruled that the city's contract was *ultra vires,* not because the city lacked the authority to enter into such contracts, but because it "failed to exercise a power it has in the manner prescribed by controlling law." *City of Lebanon,* 756 S.W.2d at 243.

In the present case, however, the Metropolitan Council passed an ordinance to adopt the proposed Agreement on the required three readings. There are no allegations of failure to give proper notice of the Council proceedings. Additionally, none of Petitioners' complaints allege that the Council acted in a manner not consistent with the charter or any applicable statute. Consequently, Petitioners arguments regarding procedural flaws in the adoption of the Agreement are without merit.

Even if the conduct of the Parks Board meetings were somehow relevant to a challenge to the Council's approval of the lease, Petitioners' complaints regarding participation at the Parks Board meetings do not rise to denials of First Amendment or due process rights, nor do they allege actions inconsistent withgoverning law.[23] The complaint is that Petitioners' attorney was deprived of the opportunity to express his clients' views at two meetings of the Parks Board. However, Petitioners have failed to establish a "right" to speak at meetings of governmental entities at all. "Neither the First Amendment nor Article 1, Section 19 of the Tennessee Constitution is subject to analysis in terms of absolutes; all basic rights of free speech are subject to reasonable regulation."

---

[22] The Supreme Court noted that "a resolution passed with all the formalities required for passing ordinances may operate as an ordinance regardless of the name by which it is called." *City of Lebanon v. Baird*, 756 S.W.2d at 243 (*citing Clapp v. Knox County*, 273 S.W.2d 694, 700 (Tenn. 1954)). However, the Lebanon City Charter set out a number of specific requirements for the enactment of a valid and binding City ordinance. Among other things, "every ordinance shall be passed on two separate days in open session of the City Council before it shall become effective," and "all ordinances shall be published at least once in a newspaper published in the City of Lebanon, or in pamphlet form, or by the posting . . . at a conspicuous place in the [County] Courthouse and/or at the City Hall. . . ." 756 S.W.2d at 241. The formal requirements of notice and of multiple readings at separate sessions were imposed "...to assure that the citizens of the municipality are adequately aware of the proposed action, its particular nature and costs, and are given an opportunity to voice their support or their opposition to the action in advance of the city's commitment to it." *City of Lebanon v. Baird*, 756 S.W.2d at 242. Further, the purpose of such charter provisions is to protect the taxpayers and "to prevent hasty and ill-considered legislation." *Id. (citing Metro Gov't of Nashville and Davidson County v. Mitchell*, 539 S.W.2d 20, 21 (Tenn. 1976)).

[23] The record shows that Mr. Johnston was not allowed to address the Parks Board because the Board determined that it did not timely receive his request to speak at either of its meetings. He argues that the Board's refusal to let him speak amounted to a violation of his clients' rights of free speech and due process. Mr. Johnston contends that he relied on a rule set out in the 2002 Policy Manual of the Parks Board, which only requires that the request be received at least five days prior to the Board meeting in question. For its part, the Board asserts that it applied an amended rule which is available from the Parks Department and on line, and which requires individuals wishing to speak to submit their written requests no later than fourteen days before the scheduled meeting.

*State v. Scott*, 678 S.W.3d 50, 52 (Tenn. 1984)(citing *H & L Messengers Inc. v. City of Brentwood*, 577 S.W.2d 444, 451 (Tenn.1979)).

Where a governmental body allows the public to speak at its meetings, it may impose reasonable regulations in order to avoid disruption or delay in the performance of its duties. *Lewis v. Cleveland Municipal Airport Authority*, No. E2007-00931-COA-R3-CV, 2008 WL 4254359 at *14-15 (Tenn. Ct. App. September 11, 2008)(Tenn. R. App. P. 11 app. den. April 27, 2009)(holding that a county had the right to set a reasonable limitation on persons who address it or, otherwise, "the meetings would be chaotic.")

In *Whittemore v. Brentwood Planning Commission*, 835 S.W.2d 11 (Tenn. Ct. App. 1992), this court reviewed an approval of a regional shopping mall over the heated objections of neighboring landowners. The lengthy review process included numerous meetings at which the neighbors communicated their support or opposition to the project. At one meeting, the planning commission declined to hear further public comment, and its chairman directed that an audience member be removed from the room. This court rejected the argument that the manner in which the planning commission dealt with public comment was a violation of due process, and ruled that "[t]he forcible removal of a lawyer from one of the planning commission's meetings in 1986 simply does not taint the entire process." *Whittemore v. Brentwood Planning Commission*, 835 S.W.2d at 18.

Furthermore, Petitioners cannot deny that Ms. Walker's and Ms. Richardson's attorney was able to submit written materials to the Parks Board and that other similarly-situated citizens expressed the same concerns at the Parks Board's meetings and various other public meetings or that their attorney was unable to address the Planning Commission or the BZA when they considered the proposal. We find no indication that Ms. Walker and Ms. Richardson, through counsel, would have presented information that differed significantly from that presented by other speakers. It appears from the record that the Parks Board conducted a full and fair hearing on the issues before it. In any event, Petitioners cannot show that denial of the attorney's request to speak at the Parks Board meetings had any legal effect on the Council's approval of the lease. The Parks Board's role was to simply recommend; several other entities and officials were later involved in the process that led to the approval; and citizens had every opportunity to make their concerns known to those officials, including the Council.

Petitioners also allege that the Parks Board violated the Open Meetings Act, Tenn. Code Ann. § 8-44-101 *et seq.*, when it used e-mail to circulate the exact text of a modification to the proposed Agreement, which modification the Parks Board had agreed to at an open meeting. They do not claim, however, that the Board violated the Open Meetings Act when it voted to recommend approval of the Agreement, subject to the as yet-to-be-drafted modification.

The Act declares that it is the policy of the state that "the formation of public policy and decisions is public business, and shall not be conducted in secret." Tenn. Code Ann. § 8-44-101(a). In order to effectuate that policy, the Act states that all meetings of any governing body "are declared to be public meetings, open to the public at all times..." Tenn. Code Ann. § 8-44-102(a). "Meeting" means "the convening of a governing body or a public body for which a quorum is required in order to make a decision or to deliberate toward a decision on any matter." Tenn. Code Ann. § 8-44-102(b)(1)(E)(2).

The record shows that the Parks Board voted at a meeting that was open to the public to recommend approval of the lease Agreement subject to a specific modification in the language of Article 6 to make it absolutely clear that Metro, through the Parks Board, had to be the ultimate gatekeeper for the use of the park and the controller of scheduling. The Board recommended approval of the Agreement, contingent on the suggested modification to Article 6.

The final draft of Article 6 was subsequently prepared and submitted to the Parks Board members via e-mail. The Board member who requested the modification then sent an e-mail to the other members stating, "the amendment satisfies my concerns. Thank you." Petitioners do not claim that the modified Agreement deviated in any respect from what the Board had agreed to. Indeed, it does not.

It appears to us that the Parks Board made its substantive decision regarding the provision it wanted included in the proposed Agreement at an open meeting. There was discussion of the intent of the additional provision, including agreement to its inclusion by Belmont. We cannot read the Open Meetings Act to require another meeting for the Board members to vote on specific language drafted by its attorneys which, undeniably, accomplishes the decision made at the meeting. In other words, since the Board had already assented to the proposed modification at a public meeting, it was not required to convene another meeting, nor to submit the Agreement to yet another vote on recommendation.

Finally, there is no allegation that the Council acted in any way that violated the Open Meetings Act. From the time the Agreement was originally proposed until its approval by Council, many modifications were made to the Agreement. It was within the discretion of the Council to accept or approve those modifications since they were incorporated into the final Agreement. Petitioners cannot establish any basis to set aside Council's approval of the Agreement based on the Parks Board's actions.

## VIII. CONCLUSION

The judgments of the trial court in all four cases are affirmed. We remand these cases to the Chancery Court of Davidson County for any further proceedings that may be necessary. Costs on appeal are taxed to the appellants, Sandra Walker, Janice Richardson, and Organized Neighbors of Edgehill, in accordance with the costs assessed in each of the separate appeals.

_____
PATRICIA J. COTTRELL, P.J., M.S.

-26-